[No. 14097.   Department Two.   October 18, 1917.]

R. R. Fox, *Respondent*, v. Seattle Contact Copper Company, *Appellant*.[1]

Corporations — Representation — Contracts — Directors — Authority.  Where four of the five directors of a corporation got together at the instance of the president, the by-laws authorizing special meetings of the board to be called at any time by the president or by a majority of the board, and entered into and signed a contract wherein the company agreed to sell and give an option upon certain shares of its capital stock, the contract is the contract of the company, and it is immaterial whether the directors signed the same on behalf of the company as individuals or as directors authorized to act at a special meeting of the board.

Same — Stock — Increase — Fictitious Issue — Sale at Less Than Par.  A contract whereby a corporation, having but 23,000 shares remaining in its treasury, and needing money for development and contemplating an increase of 1,000,000 shares, agreed to sell and give an option on from 300,000 to 500,000 shares, of the par value of one dollar each, at the stated purchase price of seven cents, is *ultra vires* and unenforcible, under Const., art. 12, § 6, providing that "all fictitious increase of stock or indebtedness shall be void"; since the purchaser was not a subscriber and the stock taken would be fictitious to the extent of 93 per cent.

Appeal from a judgment of the superior court for King county, Mackintosh, J., entered December 29, 1916, upon findings in favor of the plaintiff, in an action on contract, tried to the court.   Reversed.

*H. D. Allison* and *Peters & Powell*, for appellant.

*Trefethen & Findley*, for respondent.

Holcomb, J.—In this action by respondent against the Seattle Contact Copper Company to recover $75,000 in damages for breach of contract, findings and conclusions and a judgment for $16,500 were entered for respondent.   The defendant is a domestic mining corporation and owns and operates certain mining claims in the state of Nevada.   It had an authorized capital stock of 1,000,000 shares of the par value of one dollar per share.   During all the times

[1]Reported in 168 Pac. 185.

herein mentioned, its board of trustees or directors has been composed of V. A. Marshall, S. L. Moody, E. P. Churchill, G. W. Childs, and H. M. Casey. V. A. Marshall was at all times its president, and L. B. Walters its secretary. These men owned approximately eighty-five per cent of the original stock issue.

For some months prior to February 7, 1916, there had been considerable bargaining between the officers of the company and Mr. Fox. The company was in need of money to proceed with its development work, and respondent had become interested to the extent that he held an option to buy a certain interest in the company, and had gone so far as to employ an engineer to go with him to Nevada to look over the property and make a report to him as to the prospects. It appears that Fox did not take advantage of his option, but that further negotiations were had with Marshall until late in the year 1915, when Marshall went to California. In his absence, the negotiations seem to have been carried on by other of the directors, as a result of which, in the early part of January, 1916, H. D. Allison, the attorney for the Copper Company, drew up an agreement whereby the company agreed to sell, and Fox agreed to purchase, 300,000 shares of the capital stock of the corporation for $21,000. A copy of this agreement was mailed to Mr. Marshall at San Diego, California, by H. M. Casey, who was the treasurer of the company. About that time, an increase of capital stock seems to have been agreed to and authorized, increasing the capital stock by 1,000,000 shares of the par value of one dollar each. There still remained in the treasury 23,000 shares of the original issue. On January 21, 1916, Marshall wrote a letter to Casey at Seattle, in which he stated, among other things, the following:

"Yours with memo of proposed agreement with Mr. Fox is at hand and in reply will say that the same is agreeable to me. . . . I would want this agreement to be satisfactory to Moody. . . ."

Marshall also states in this letter that Casey had better get Moody to come down from Mount Vernon, where he lived, to Seattle and show him this letter just quoted. · After receiving this letter, Casey notified Childs, one of the directors, who also lived in the region of Mount Vernon, of the receipt of this letter, and asked him to get Moody to come down to Seattle. It appears that Moody then notified Churchill, the other director, who lived in Seattle, to be there; that there was to be a meeting to talk matters over with Fox.

On February 7, 1916, Moody, Childs, Churchill, and Casey, who were four of the five members of the board of directors, met Fox at the Hotel Butler, in Seattle. It seems well established by the evidence that there was no formal call for this meeting as a meeting of the board of directors of the company. The secretary, Mr. Walters, did not know about it and was not there. But even the most casual reading of Walters' testimony shows such a lack of knowledge of the business of his company that one is not at all surprised when he admits that he is just a "figure head" in the company. Even had there been no such call, § 6, art. 3, of the by-laws of the company reads as follows:

"Special meetings of the board of trustees may be called at any time by the president or by a majority of the trustees."

Four of the five members of the board of trustees of the company having met with Fox on February 7, 1916, on that date the document was signed upon which Fox bases his action. The contract entered into at this meeting is alleged in respondent's complaint to be as follows:

"Contract to Purchase Stock and Option to
Purchase Stock

"The Seattle Contact Copper Company, through its board of directors, offers to sell, and R. R. Fox hereby agrees to purchase 300,000 shares of capital stock of the Seattle Contact Copper Company for the purchase price of twenty-one thousand dollars ($21,000); it is agreed that the purchase price shall be paid to the treasurer of the Seattle Contact

Copper Company in the sums of fifty-two hundred fifty dollars ($5,250) within thirty (30) days time whenever directed to do so by the said Seattle Contact Copper Company, for development of the mine, and whenever there shall be paid in to the treasurer of the Seattle Contact Copper Company the sum of fifty-two hundred fifty dollars ($5,250) there shall be issued to R. R. Fox or his order seventy-five thousand (75,000) shares of said company, it being understood that the said sum shall be paid as fast as needed for the development of and other purposes of the said company, and that all of the said sums shall be paid within one year from the date hereof. It is further agreed that there is hereby given an option to the said R. R. Fox to purchase an additional two hundred thousand (200,000) shares of the said Seattle Contact Copper Company for the sum of twenty thousand dollars ($20,000) or any part thereof at a like proportional rate, it being provided, however, that the said option is a limited option, and shall not be exercised by the said R. R. Fox unless in the event that the said Seattle Contact Copper Company requires additional sums for the development of its property so as to require the sale of additional stock to raise money for such purpose, in other words, it is understood that the said option shall not be exercised by the said R. R. Fox unless the said Seattle Contact Copper Company shall need additional funds, and need to sell stock for such purpose, it being provided, however, that in the event that the said company shall be required to sell additional stock for such purpose, then this option shall be open to acceptance, that the said twenty thousand (20,000) dollars herein referred to in the exercise of the said option shall be paid into the hands of the said Seattle Contact Copper Company within eighteen (18) months from this date, and at such dates and in such amounts as the said company shall require; said sums being not less than five thousand dollar ($5,000) payments, and when so made there shall be issued fifty thousand (50,000) shares of stock. Feb. 7th, 1916.

"As individual directors we agree to this arrangement on the part of the Seattle Contact Copper Co.

"S. L. Moody,
"E. P. Churchill,
"G. W. Childs,
"H. M. Casey.

"Accepted: R. R. Fox."

There is a great conflict in the evidence as to what took place at this meeting. Two points of difference are: (1) What is the correct reading of the document at the time it was signed? (2) What was the understanding of the parties as to whether there was then being held a meeting of the board of directors or trustees? As to the first point, the contention is regarding the clause that immediately precedes the signatures. Plaintiff's Exhibit A is the copy of this agreement that was signed at this meeting and kept by Fox. The clause referred to in his copy reads, "As individual directors we agree to this arrangement on the part of the Seattle Contact Copper Company;" the letter "s" concluding the word "individuals" being crossed out and the word "directors" inserted above the line. Plaintiff's Exhibit A-1, the copy kept by Churchill for the company and set up by appellant, reads: "As individuals we agree to this arrangement on the part of the Seattle Contact Copper Company." In both of these copies it is to be noted that the document proper is typewritten, but that this clause is put in with pen and ink. Fox admits that, on his copy and on the other, he wrote, "We agree to this arrangement on the part of the Seattle Contact Copper Company." Owing to a desire on the part of all the directors not to appear to bind the company, Churchill wrote in the words "as individuals." The agreement was in this form, they all maintain, when it was executed by them. Fox, however, testifies that he changed the written matter by striking out the letter "s" after the word "individuals" and inserting the word "directors." He admits that he did this after the document was signed, but that he did it at the meeting. None of the other parties to the agreement seem to know when this change was made. It may be noted that in none of the other terms of the agreement is there any change, and it was in all other respects as prepared by Allison and submitted to Marshall by mail before the meeting, and of which he wrote it was "agreeable to him."

After having signed this agreement, Fox appears to have made a provision, to which no objection was offered, that he would carry out this agreement if, after a careful examination, the records and accounts of the Copper Company were found correct. On February 15, after he had made his examination, he addressed a letter to the Copper Company in care of Casey as its treasurer, in which he stated that he was willing to "execute the agreement," and enclosed his check for $1,000. The check was returned to him on February 28, by Casey, who, in his letter of that date, said that he returned it at the request of Marshall. It would appear that Fox considered himself bound by the agreement from this time until May 31, 1916, when he tendered to Casey the sum of $21,000. It is at this time, he claims, that there was a breach of the contract, as the tender was refused.

We shall not follow counsel over the extended field of discussion as to whether or not the writing in issue was the contract of the company or was merely a contract by four of the five directors that they, as individuals, agreed to, at some time, be willing to enter into such a contract for and on behalf of the company. To our minds, it was as complete an executory contract of sale as could possibly be formulated. It was the full expression of the meeting of the minds of the parties. It expressly stated that the company, not the individuals, "offered to sell", and Fox "agreed to purchase", the 300,000 shares of capital stock of the company; fixed the purchase price thereof, and stipulated the times and method of paying for and delivering the stock. These individuals met together at the instance of the president and remaining director of the company, in a manner permitted by the corporate by-laws, for the purpose of considering the terms and form of the very agreement which they signed, and which all admitted was satisfactory to them and each of them. It is but to quibble trivially to press the evasive effect of the last clause, inserted in the contract at the time of its adoption, as avoiding obligation on the part of the corpora-

tion. These men were the corporation, dealt with the corporate affairs, and the contract was so intended or nothing was intended.

This determination of the status of the contract, however, has the inevitable effect of greatly strengthening another defense set up in the case by appellant and making it a bulwark impregnable to all attacks by respondent. The individuals, acting for the company, builded probably better than they knew by engaging the company in an *ultra vires* contract.

Section 6 of art. 12 of the constitution of Washington provides:

"Limitation upon issuance of stock. Corporations shall not issue stock, except to *bona fide* subscribers therefor, or their assignees; . . . All fictitious increase of stock or indebtedness shall be void."

The first clause of this section has but slight relevancy; the last clause is all controlling. The company, at the time of the agreement, had but 23,000 shares remaining in its treasury for sale. It was understood between the parties hereto, and, in fact, respondent was careful and shrewd enough to ascertain and satisfy himself, that the capital stock of the company would be increased by another 1,000,000 shares of the par value of one dollar each. Corporate action had been taken to effectuate that increase, and all that remained to be done was to complete the formal filing with the secretary of state of amendatory articles. Respondent well understood, according to the evidence, that the 300,000 shares to be sold and issued to him were to come almost entirely (excepting the 23,000 shares of stock remaining in the treasury) from the new issue of increased capital stock, and that this increase was voted so as to get this money. The contract was to sell to respondent this stock of the par value of one dollar per share for seven cents per share. To the extent of 93 cents per share of so much of the 300,000 shares as was to come from the increase of stock, or 277,000

shares, the issue would undoubtedly be fictitious and prohibited by the constitution.

This construction has been placed upon such a stock issue by the court of appeals of New Jersey in a case affected by this section and clause of our constitution, in *Coler v. Tacoma R. & Power Co.*, 65 N. J. Eq. 347, 54 Atl. 413, 103 Am. St. 786. While we are not, as an original proposition, bound by the construction of our constitution and statutes by other courts of equal authority only, nevertheless such constructions are entitled to great respect when consonant with reason. And this construction is in concurrence with the weight of authority where similar constitutional limitations exist. *Fisk v. Chicago, R. I. & Pac. R.*, 53 Barb. (N. Y.) 513; *Scott v. Abbott*, 160 Fed. 573; *Clarke v. Lincoln Lumber Co.*, 59 Wis. 655, 18 N. W. 492.

This is not a case where the corporation first duly increased its authorized capital and then put the shares out in the market for sale for the best price obtainable, as was the case of *Handley v. Stutz*, 139 U. S. 417, cited by respondent. Nor is it a case where respondent can claim that he became either a subscriber or a purchaser in consequence of frauds practiced upon him. He himself investigated the company, its properties, and its capitalization. He doubtless considered he was purchasing the stock at a bargain, and he is here suing for the lost profits of his bargain. He is not seeking to be admitted to the rights of a shareholder. He does not, and, indeed, he cannot, assert himself to be a subscriber to an issue of stock. If he did he would be obliged, in order to support an action as a subscriber, either for specific performance or for lost profits on a purchase of specific stock, to tender the whole amount of the subscription (full payment); in other words, he must have tendered, not seven cents per share, but one hundred cents per share. But that was not the contract, nor his claim. He must, therefore, be deemed a purchaser from the corporation itself, by direct negotiation, of new stock, of the par value of one dollar per

share, for seven cents per share. He apparently carefully avoided incurring the full contingent liability of a subscriber for stock. He contracted to purchase a quantity of stock which is ninety-three per cent fictitious. His contract is entire. He does not assume the liability of a subscriber. His intended purchase of a fictitious issue of increased stock is illegal. From such predicament there is no avenue of escape open to him. He can take nothing.

The judgment is reversed.

ELLIS, C. J., MOUNT, PARKER, and FULLERTON, JJ., concur.